Brian S. King, #4610
Nediha Hadzikadunic, #15851
**BRIAN S. KING PC**
336 South 300 East, Suite 200
Salt Lake City, Utah 84111
Telephone: (801) 532-1739
Facsimile: (801) 532-1936
brian@briansking.com

Attorney for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JIM L., CHRISTINE L., and ALEXA L.,<br><br>    Plaintiffs,<br><br>v.<br><br>ANTHEM BLUE CROSS and the NORTHRUP GRUMMAN HEALTH PLAN<br><br>    Defendants. | COMPLAINT<br><br>Civil No. 2:18-cv-00671 DB |

Plaintiffs Jim L. ("Jim"), Christine L. ("Christine"), and Alexa L. ("Alexa") through their undersigned counsel, complain and allege against defendants Anthem Blue Cross ("Anthem") and the Northrup Grumman Health Plan ("the Plan") as follows:

**PARTIES, JURISDICTION AND VENUE**

1. Jim, Christine, and Alexa are natural persons residing in San Diego County, California. Jim and Christine are Alexa's parents.

2. The Plan covering Jim and Alexa is a self-funded employee welfare benefits plan under 29 U.S.C. §1001 et. seq., of the Employee Retirement Income Security Act of 1974 ("ERISA"). Jim was a participant in the Plan, and Alexa was a beneficiary of the Plan at all relevant times.

3. Anthem provides insurance and third party administrative services to a variety of individuals and businesses across the United States. Anthem is the third party claims administrator for the Plan. Anthem denied claims for healthcare services provided to Alexa.

4. Alexa received medical care and treatment in Utah at Sunrise Residential Treatment Center ("Sunrise"), a licensed residential treatment center that specializes in treating adolescent girls with mental health issues.

5. This Court has jurisdiction over this case under 29 U.S.C. §1132(e)(1) and 28 U.S.C. §1331.

6. Venue is appropriate under 29 U.S.C. §1132(e)(2) and 28 U.S.C. §1391(c) based on ERISA's nationwide service of process and venue provisions, because Anthem does business in Utah and Alexa's treatment was provided in Utah. Finally, in light of the sensitive nature of the medical treatment at issue, it is the Plaintiffs' desire that the case be resolved in the State of Utah where it is more likely their privacy will be preserved.

7. The remedies that Jim and Alexa seek under the terms of ERISA and the Plan are for benefits due under the terms of the Plan and pursuant to 29 U.S.C. §1132(a)(1)(B), for appropriate equitable relief under 29 U.S.C. §1132(a)(3) based on the Defendants' violation of the Mental Health Parity and Addiction Equity Act of 2008 ("MHPAEA") an award of prejudgment interest, and an award of attorney fees and costs pursuant to 29 U.S.C. § 1132(g).

## BACKGROUND FACTS

### Alexa's History and Treatment

8. Jim adopted Alexa one day after her birth. Although Alexa's family medical history is mostly unknown, Alexa's birth mother has stated that Alexa's biological brother has experienced similar struggles as Alexa.

9. From a very young age, Alexa was hypersensitive to noise and environmental conditions. From three months to a year old, she had to wear full length clothing to prevent her from scratching herself raw on her arms and legs. Alexa sucked her thumb as an infant, and continues this habit to the present day.

10. Alexa was highly social, but often engaged in aggressive or manipulative behavior to get her way, especially if she were in a group setting but was not the center of attention. Alexa bullied other children, and would steal their candy or lunches. If she couldn't get her way through violence and intimidation, Alexa would incite other children to join in and bully her victims with her.

11. Alexa's violent behavior escalated as she got older. She would often have grisly, unsettling dreams that she would describe in detail. She threatened a child saying that she would kill her by lighting her hair on fire and made plans to take a knife and cut, or threaten to cut, the throat of an older boy at his house. After this incident, Alexa started therapy.

12. Alexa saw a variety of therapists, psychiatrists, and psychologists, and was diagnosed with Obsessive Compulsive Disorder. Although Alexa was only seven at the time, her therapist strongly suspected that Alexa had Borderline Personality Disorder. This diagnosis was confirmed when Alexa turned fifteen. Alexa was prescribed a variety of medications, but often refused them or lied about taking them.

13. Alexa had to leave two different aftercare programs after having conflicts with staff and other children. A nanny was hired to help deal with Alexa, but soon quit after Alexa threatened her by throwing a shoe at her, and telling her that the next time it would be a knife.

14. Alexa was put on an Individual Education Plan at school, but she continued to have difficulty concentrating, and often refused to complete tasks or to go to school. Alexa had difficulty reading social cues correctly, and she stopped having playdates or getting invited to birthday parties. After three years of treatment, Alexa's primary therapist suggested that Alexa find a new therapist as little progress was being made.

15. Jim and Alexa moved to San Diego so that Alexa could attend a special therapeutic school called New Bridge. Alexa started treatment with a new therapist, but shortly afterward started refusing therapy, and at times would not even enter the building. When she did attend, she was uncooperative and withdrawn. Alexa continued to exhibit violent behavior during this time period and threatened her mother with a knife.

16. Alexa's mother went back to work to help pay for Alexa's private schooling. Alexa's parents hired nannies to help care for her, and they went through five nannies over a period of a couple of years. Alexa would swear at the nannies, threaten them, and pulled knives on the nannies and her mother.

17. In the sixth grade, Alexa began to show signs of self-harm. She began by using paperclips and plastic knives, but eventually escalated to cutting her arms and legs with a steak knife. Alexa continued therapy, but remained disengaged. Alexa was evaluated by a school psychologist who determined that Alexa met the emotionally disturbed special education eligibility category due to a "general pervasive mood of unhappiness or depression." Additionally, the psychologist found that Alexa had a "tendency to develop physical symptoms or fears associated with personal or school problems."

18. Alexa's self-harm escalated, and she was taken to the emergency room in May of 2012, after expressing suicidal thoughts to Jim.

19. Alexa attended summer camp in 2014, where she claims she was raped by a thirteen year old boy. In September of 2014, Alexa attempted suicide by overdose and was admitted to the emergency room. Alexa's doctor recommended that she be treated in a program focused on dialectical behavior therapy ("DBT")

20. Jim signed Alexa up for weekly DBT therapy sessions, but she avoided the sessions as often as she could and frequently ran away or made a scene to avoid them. Alexa again attempted suicide by overdose in October of 2015, and was admitted to the emergency room. Afterwards, Alexa started pulling out her hair and eyelashes in clumps and picked at scabs until they bled.

21. At night, Alexa routinely hit her head against the pillow in an effort to soothe herself and to sleep more easily. When Jim asked her about this behavior, she replied that she did this for hours each day, sometimes multiple times a day. Eventually Alexa started having intense headaches and went to see a neurologist who informed her that she had given herself a concussion from "repetitive stereotyped movement."

22. In May of 2016, Alexa again attempted suicide by overdosing on pills, and used a meat cleaver to cut on her thighs, stomach, arms, and across her throat. She told a friend what she had done, and was taken to the emergency room. Following this incident Alexa was admitted to Sunrise.

**Sunrise**

23. Alexa was admitted to Sunrise on May 13, 2016.

24. Although Anthem initially approved Alexa's treatment, on August 1, 2016, Anthem sent a letter denying Alexa's treatment at Sunrise from May 23, 2016, to June 2, 2016. The reviewer gave the following justification for the denial:

> …You went to residential treatment for your mental health condition and your stay was approved. A request was made to extend your stay. The plan's clinical criteria considers short-term residential treatment medically necessary for those who meet certain criteria and improvement can be expected from a short-term residential stay. The information we received after your stay was approved shows the program you're in is planned for 6 to 8 months. A program of this length is not considered short term residential treatment. For this reason, the request for you to remain in this long-term residential treatment program is denied as not medically necessary. There may be other options to help you work through the issues you're dealing with, such as short-term residential treatment or outpatient services. We encourage you to discuss other treatment options with your doctor. …

25. On January 18, 2017, Sunrise requested a level one appeal of the denial of Alexa's treatment on Jim's behalf. Sunrise wrote that although Anthem's denial letter denied payment for dates of service between May 23, 2016, and June 2, 2016, Anthem should evaluate all denied dates of Alexa's treatment from May 23, 2016, forward as she was still in treatment at that time.

26. Sunrise argued that Anthem's reviewer Dr. Shah was a pediatric general practitioner with no background in adolescent psychiatry and was therefore unqualified to make the review. Sunrise wrote that in addition to expressing suicidal intent and homicidal behavior, Alexa had been diagnosed with Major Depressive Disorder, Anxiety Disorder with Social Phobia, Cluster-B personality traits, and a Parent-Child Relational Problem among other issues. Sunrise contended that it was unrealistic for Anthem to expect an individual like Alexa who was suffering from these varied conditions to be cured after ten days of treatment.

27. Sunrise included a copy of Alexa's medical records with the appeal.

6

28. On February 20, 2017, Anthem sent Sunrise a letter informing them that Alexa's appeal had been withdrawn. The letter stated in part:

> Anthem UM Services, Inc. is a separate company providing utilization review services on behalf of Anthem Blue Cross and Blue Shield. We are withdrawing the appeal for: continued residential treatment care. This information was initially handled as a provider dispute. Upon careful review, we have determined that the correspondence submitted to Anthem UM Services, Inc. did not meet the criteria for a provider dispute for the following reason(s): a provider dispute is a post service/ post discharge, provider appeal option. According to our records, as of February 20, 2017, this member is still receiving residential treatment center care.
> …

29. Although Anthem's previous letter stated that it was withdrawing the appeal, Anthem also sent a letter dated February 23, 2017, responding to Sunrise's level one appeal and maintaining the denial of care. The reviewer gave the following justification for the denial:

> …We reviewed all the information that was given to us before with the first request for coverage. We also reviewed all that was given to us for the appeal. Your doctor wanted you to stay longer in residential treatment care. You were getting this because you had been at risk for serious harm without 24 hour care. We understand that you would like us to change our first decision. Now we have new information from the medical record. We still do not think this was medically necessary for you. We believe our first decision was correct for the following reason. After the treatment you had, you were no longer at risk for serious harm that needed 24 hour care. You could have been treated with outpatient services. We based this decision on this health plan guideline (Psychiatric Disorder Treatment-Residential Treatment Center (RTC) (CG-BEH-03))…

30. On August 17, 2017, Jim submitted a level two appeal of the denial of Alexa's treatment at Sunrise. Jim pointed out that Anthem had issued two conflicting responses to Sunrise's appeal, first Anthem stated that the appeal had been withdrawn because it did not meet the definition of a provider dispute, then it subsequently claimed that the appeal had been denied because care was not considered medically necessary.

7

31. Jim wrote that Anthem had disregarded the request to consider all of the dates of Alexa's treatment, and had limited its review to the dates between May 23, 2016, and November 30, 2016. Jim again requested that Anthem consider the entirety of Alexa's treatment at Sunrise.

32. Jim argued that Anthem was in violation of ERISA requirements by failing to provide him with the specific criteria it had utilized to deny care. Jim claimed that Anthem had stated a conclusion without providing any explanation as to how it had arrived at that conclusion as required by ERISA. Jim also alleged that Anthem's response was deficient as it did not state whether the reviewer possessed the necessary qualifications in child and adolescent psychiatry to properly evaluate Alexa's treatment at Sunrise.

33. Jim wrote that Anthem had acknowledged the severity of Alexa's psychological issues by authorizing ten days of treatment. He argued however, that the average length of stay in a residential treatment center was for a period of six to twelve months, and that ten days of treatment was barely enough time to put a treatment plan in place, let alone enough time for Alexa to make any progress on the serious behavioral and mental health issues that had led to her admission to Sunrise.

34. Jim included several letters of medical necessity with the appeal. In a letter dated January 17, 2017, Valerie Kelly PsyD, MSN, RN, wrote in part:

> …[G]iven the severity of her problems while in my care and the suicide attempts reported of late, I would concur that she would benefit from extensive therapy in residential treatment to adequately address the scope of her problems.

In another letter dated January 17, 2017, Dr. DeeAnn Wong wrote in part:

> …[Alexa] needed a higher more intensive level of care because of her chronic, repeated cutting and escalation of lethality of suicide attempts. Her learning disorder made outpatient treatment of her Major Depression more difficult because of the processing deficits in her ability to accurately hear and


comprehend verbal and visual information. This combination of factors created a situation where it was necessary for her to be in a longer-term setting like a residential program to make meaningful gains in therapy before she was successful in killing herself.

35. Alexa's counselor Traci Barker-Ball wrote in a letter dated July 5, 2017:

   …Being in my current position for over twenty-two years, I have met with many students. It is my professional and personal opinion that Alexa needed more care than we were able to provide at school. On numerous times when we met she expressed concerns that she didn't feel her outside therapy and medications were working well enough to keep her stable. …

36. Jim included a copy of Alexa's medical records with the appeal, and these records showed that Alexa continued to have significant struggles with depression and suicidal ideation while in treatment. In addition to making frequent threats against her own safety, Alexa also threatened staff and peers with physical violence.

37. Treatment notes from June 4, 2016, June 14, 2016, June 26, 2016, June 30, 2016, August 8, 2016, August 11, 2016, August 15, 2016, October 7, 2016, October 8, 2016, October 9, 2016, October 10, 2016, October 15, 2016, and October 17, 2016, all reference times when Alexa either attempted suicide or expressed a strong desire to commit suicide. Sunrise staff put her on safety status multiple times for her own protection in response to these incidents. In addition to these instances, the medical record is replete with references to Alexa's desire to self-harm, her feelings of worthlessness, obsessive-compulsive actions, threats of physical violence to herself and others, and other aberrant behaviors. These behaviors lessened in severity over time with treatment, but continued through Alexa's discharge on August 7, 2017.

38. Jim requested that if the denial was maintained that Anthem provide references to the specific portions of the medical record it was relying on to come to the decision to deny payment for Alexa's treatment.

39. On September 14, 2017, Anthem sent Jim a letter partially overturning the denial of Alexa's care. The reviewer overturned the denial of Alexa's treatment from May 23, 2016 to July 1, 2016, but opined that treatment after that date was not medically necessary. The reviewer then quoted the denial rationale referenced in the February 23, 2017 denial letter nearly verbatim, quoted the summary plan description's definition of medical necessity, and disputed Jim's assertion that Anthem had not properly met ERISA requirements.

40. Although the reviewer stated that the denial of Alexa's treatment had been partially overturned, the letter makes no attempt to explain why the denial had been reversed, and gave no justification as to why Anthem had chosen July 1, 2016, as the last date that treatment was considered necessary.

41. Alexa was discharged from Sunrise on August 7, 2017.

42. Jim and Alexa exhausted their pre-litigation appeal obligations under the terms of the Plan and ERISA.

43. Anthem's wrongful denial has harmed the Plaintiffs in that they have paid out of pocket for Alexa's treatment an amount exceeding $85,000

**FIRST CAUSE OF ACTION**
**(Claim for Recovery of Benefits Under 29 U.S.C. §1132(a)(1)(B))**

44. ERISA imposes higher-than-marketplace quality standards on insurers. It sets forth a special standard of care upon plan fiduciaries such as Anthem, acting as agent of the Plan, to "discharge [its] duties in respect to claims processing solely in the interests of the participants and beneficiaries" of the Plan. 29 U.S.C. §1104(a)(1).

45. ERISA also underscores the particular importance of accurate claims processing and evaluation by requiring that administrators provide a "full and fair review" of claim denials. 29 U.S.C. §1133(2).

46. The Defendants breached their fiduciary duties to Jim and Alexa when they failed to comply with their obligations under 29 U.S.C. §1104 and 29 U.S.C. §1133 to act solely in the interest, and for the exclusive purpose of providing benefits to, ERISA participants and beneficiaries and to provide a full and fair review of Jim's claims.

47. The actions of Anthem in failing to provide coverage for Alexa's medically necessary treatment at Sunrise is a violation of the terms of the Plan and Anthem's medical necessity criteria.

48. The actions of Anthem in failing to provide a consistent basis for denial during the appeals process is a violation of ERISA's claims procedure regulations and the terms of the Plan.

**SECOND CAUSE OF ACTION**
**(Claim for Violation of MHPAEA Under 29 U.S.C. §1132(a)(3))**

49. MHPAEA is incorporated into ERISA and is enforceable by ERISA participants and beneficiaries as a requirement of both ERISA and MHPAEA.

50. Generally speaking, MHPAEA requires ERISA plans to provide no less generous coverage for treatment of mental health and substance use disorders than they provide for treatment of medical/surgical disorders.

51. Specifically, MHPAEA prohibits ERISA plans from imposing treatment limitations on mental health or substance use disorder benefits that are more restrictive than the predominant treatment limitations applied to substantially all medical and surgical benefits and also makes illegal separate treatment limitations that are applicable only with respect to mental health or substance use disorder benefits. 29 U.S.C. §1185a(a)(3)(A)(ii).

52. Impermissible nonquantitative treatment limitations under MHPAEA include, but are not limited to, restrictions based on geographic location, facility type, provider specialty, and other criteria that limit the scope or duration of benefits for mental health or substance use disorder treatment. 29 C.F.R. §2590.712(c)(4)(ii)(H).

53. Comparable benefits offered by the Plan for medical/surgical treatment analogous to the benefits the Plan excluded for Alexa's treatment at Sunrise include sub-acute inpatient treatment settings such as skilled nursing facilities, inpatient hospice care, and rehabilitation facilities. For none of these types of treatment does Anthem exclude coverage for medically necessary care of medical/surgical conditions based on geographic location, facility type, provider specialty, or other criteria in the manner Anthem excluded coverage of treatment for Alexa.

54. In addition, the Defendants violate 29 C.F.R. §2590.712(c)(4)(i) because the terms of the Plan and the criteria utilized by the Plan and Anthem, as written or in operation, use processes, strategies, standards, or other factors to limit coverage for mental health or substance use disorder treatment in a way that is inconsistent with, and more stringently applied, than the processes, strategies, standards or other factors used to limit coverage for medical/surgical treatment in the same classification.

55. The actions of the Defendants, as outlined above, have caused damage to Jim, in the form of denial of payment for medical services rendered to Alexa in an amount exceeding $85,000.00

56. Anthem is responsible to reimburse Jim for Alexa's medical expenses as benefits due under ERISA and MHPAEA, together with prejudgment interest and an award of attorney fees and costs under 29 U.S.C §1132 (g).

WHEREFORE, the Plaintiff seeks relief as follows:

1. Judgment in the full amount under the terms of the Plan that is owed for Alexa's medically necessary treatment at Sunrise, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 28th day of August, 2018.

/s/ Brian S. King
Brian S. King
Attorney for Plaintiff

Plaintiffs' Address:
San Diego County, California

1. Judgment in the full amount under the terms of the Plan that is owed for Alexa's medically necessary treatment at Sunrise, plus pre and post-judgment interest to the date of payment;

2. Attorney fees and costs incurred pursuant to 29 U.S.C. §1132(g); and

3. For such further relief as the Court deems just and proper.

DATED this 28th day of August, 2018.

/s/ Brian S. King
Brian S. King
Attorney for Plaintiff

Plaintiffs' Address:
San Diego County, California